CLERKS OFFICE US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED
November 18, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Nik Sams
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
CHARLOTTESVILLE DIVISION

HUNTER M. SMITH,

*Plaintiff,*

v.

THE RECTOR & VISITORS OF THE UNIVERSITY OF VIRGINIA, ET AL.,

*Defendants.*

CASE NO. 3:26-CV-00065

**MEMORANDUM OPINION & ORDER**

JUDGE NORMAN K. MOON

Plaintiff, Hunter M. Smith, alleges he was defamed and that his due process rights were violated by an unfavorable letter of recommendation authored by the Defendants, four individual members of the University of Virginia's Post-Baccalaureate Pre-Medical Program Committee. Dkt. 1. The Defendants moved to dismiss for failure to state a claim and for lack of subject matter jurisdiction. Dkt. 25. For the following reasons, Plaintiff's allegations are insufficient to support either claim and must be dismissed.

## I. BACKGROUND

The University of Virginia's ("UVA") Post-Baccalaureate Pre-Medical Program is a one-year curriculum designed for pre-med students who did not complete all prerequisites during their undergraduate study. *See* Dkt. 1 ¶¶ 21–23. The Program involves structured course work in biology, chemistry, physics, and related sciences, along with clinical opportunities and personalized guidance for medical school applications. *See id.* ¶¶ 22–24, 41. The Program also boasts a 94% medical-school placement rate and, accordingly, is highly selective, requiring stand-out undergraduate grades, letters of recommendation, and a demonstrated commitment to the field of medicine. *Id.* ¶¶ 26–27.

Plaintiff was enrolled in the Program during the 2024–2025 academic year. *Id.* ¶ 38. He did exceptionally well, earning a "near-perfect" GPA and a 96th-percentile score on the Medical College Admission Test ("MCAT"). *Id.* ¶¶ 39–40. He also alleges that he "substantially participated in clinical, volunteer, and medically related activities." *Id.* ¶ 45.

In the Spring of 2025, Plaintiff applied to thirty medical schools for admission the following fall. *Id.* ¶ 50. To support his applications, Plaintiff asked several of his professors for letters of recommendation. *Id.* ¶ 51. In addition, Plaintiff asked the Committee of the Program for a letter of recommendation. *Id.* ¶ 83. These "Committee Letters" reflect "the Program's collective institutional assessment of the applicant," scaled on a score of 1 (unable to recommend at this time) to 5 (recommended with enthusiasm). *Id.* ¶¶ 31, 82. While not strictly required, Committee Letters are encouraged because they carry significant weight in admissions. *See id.* ¶¶ 30–36, 85.

Plaintiff alleges that he received "highly favorable" letters from his individual recommenders, who praised his intellect, work ethic, personality, and overall potential to succeed in medical school. *See id.* ¶¶ 52–81 (discussing the individual letters). In contrast to these letters, however, the Committee allegedly wrote a "materially adverse" letter and assigned Plaintiff a score of 2 (recommended with reservations). *Id.* ¶¶ 88, 92. Plaintiff alleges that the Committee Letter started as complimentary of his academic success and clinical experience, but then transitioned to criticism of his maturity, attendance, communication, and social skills. Specifically, the Committee allegedly wrote that (1) Plaintiff "was not as consistent with keeping his shadowing assignments or communicating his attended class absences as expected;" (2) "at times [Plaintiff] had difficulty following the flow of conversation in class;" (3) "many social interactions with Plaintiff felt awkward and disjointed," and ultimately opined that; (4) Plaintiff "would benefit from some maturing years before heading to medical school." *Id.* ¶¶ 92, 103.

Plaintiff was rejected by all thirty medical schools he applied to, twenty-eight rejecting him without an interview. *See id.* ¶¶ 196–198. Given his otherwise strong qualifications, Plaintiff identifies the Committee letter as the clear explanation for this failure. *See id.* ¶¶ 199–200. But not only did the letter devastate these thirty applications, Plaintiff maintains—it also "derail[ed] his entire future and eradicate[ed] his chances of pursuing a career in medicine." *Id.* ¶ 9. As a result, Plaintiff alleges he continues to suffer "emotional, psychological, financial, and reputational" harm. *Id.* ¶ 202.

To remedy these alleged harms, Plaintiff brings two claims[1] against four members of the Program Committee.[2] First, he asserts a procedural due process claim under 42 U.S.C. § 1983. *See id.* ¶¶ 203–228. Second, he asserts a claim for defamation under Virginia law. *See id.* ¶¶ 229–242. In response, Defendants moved to dismiss each claim. Dkt. 25.

## II. LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has stated a claim on which the court can grant relief. Although a complaint "does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action" in order to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also id.* at 555 ("[The complaint's f]actual allegations must be enough to raise a right to relief above the speculative level[.]" (citation omitted)); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action,

---

[1] At Plaintiff's request, the Court will dismiss without prejudice his claim for breach of contract against the University of Virginia (Count III). *See* Dkt. 32 at 24; Fed. R. Civ. P. 41(a)(2).

[2] Susan Salko, Program Director; Dr. Robert Powers, Medical Advisor and Lecturer; Dr. George Hoke, Medical Advisor and Lecturer, and; Jillian Golaszewski, Assistant Program Director. Dkt. 1 ¶ 84.

supported by mere conclusory statements" are insufficient, but a plausible claim for relief that permits the court to "infer more than the mere possibility of misconduct" based upon "its judicial experience and common sense" will be allowed to proceed. *Iqbal*, 556 U.S. at 678–79. And "[w]hen assessing the complaint's plausibility, the Court must 'assume as true all its well-pleaded facts and draw all reasonable inferences in favor of the plaintiff.'" *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 145 (4th Cir. 2019) (quoting *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017)).

## III. ANALYSIS

### 1. Procedural Due Process (Count I)

The Due Process Clause of the Fourteenth Amendment guarantees certain procedural safeguards before an individual is deprived of their life, liberty, or property by state action.[3] *See, e.g.*, *LaChance v. Erickson*, 522 U.S. 262, 266 (1998) ("The core of due process is the right to notice and a meaningful opportunity to be heard."). Plaintiff alleges that the Defendants violated this guarantee "when they failed to notify him of the adverse Committee Letter and did not permit him an opportunity to respond or request a revision" before he submitted it with his medical school applications. Dkt. 1 ¶ 210. But the Due Process Clause does not protect against every conceivable injury that might flow from official state action; it only protects against injuries flowing from the deprivation of some constitutionally cognizable interest in life, liberty, or property. "These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law," and therefore, "the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status." *Paul v. Davis*,

---

[3] Defendants acknowledge that they are state actors who acted under color of state law by writing the Committee Letter. *See* Dkt. 26 at 15–17; 42 U.S.C. § 1983. Finding it unnecessary, the Court expresses no view on their further argument that Plaintiff's injuries are too attenuated from their actions to constitute a deprivation.

424 U.S. 693, 710 (1976); *see also id.* at 710 n.5 (clarifying that the Due Process Clause also protects those interests "guaranteed in one of the provisions of the Bill of Rights which has been 'incorporated' into the Fourteenth Amendment.").

Plaintiff asserts a constitutionally protected liberty interest in his "good name, reputation, honor and integrity" and a constitutionally protected property interest in "pursuing and continuing his education, as well as in future educational and employment opportunities." Dkt. 1 ¶¶ 212, 224. The Defendants' actions, he alleges, deprived him of each interest, for which he seeks compensatory damages and an injunction requiring the retraction of the Committee Letter and the issuance of a "new, accurate, and truthful" one. *See id.* ¶¶ 212–223 (liberty interest); *id.* ¶ 224 (property interest); *id.* ¶¶ 225–228 (requested remedies). For the following reasons, however, neither interest suffices to support Plaintiff's claim.

i. *Liberty Interest*

Plaintiff's asserted liberty interest in his "good name, reputation, honor, and integrity" invokes the concept of a "stigma-plus" claim. The Constitution does not generally protect against reputational harm caused by state action. *See Paul*, 424 U.S. at 701–06. However, "[w]here a person's good name, reputation, honor, or integrity is at stake *because of what the government is doing to him*, notice and an opportunity to be heard are essential." *Id.* at 707 (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). The "plus" is that the stigmatizing state action also "deprived the individual of a right previously held under state law." *Id.* at 708.

Therefore, to state a valid stigma-plus claim, a plaintiff must establish: "(1) a stigmatizing statement, (2) some type of dissemination, and (3) some other government action that alters or extinguishes one of his legal rights." *Doe v. Univ. of N.C. Sys.*, 133 F.4th 305, 319 (4th Cir. 2025) (internal quotation omitted). Assuming that the first two elements are met—though in no

way suggesting they are—Plaintiff's stigma-plus claim fails because he does not plausibly allege that the Committee Letter altered or extinguished any of his legal rights. In other words, he has not established the "plus."

Plaintiff alleges the "plus" is how the Committee Letter "destroyed his chances of being able to pursue a career in medicine, depriving him of his right to pursue an occupation of his choosing." Dkt. 1 ¶ 223. The dispositive flaw with Plaintiff's theory is that neither Virginia law nor the U.S. Constitution recognize its basic premise: a legal *entitlement* to admission into medical school. *See generally M.B. by & through Brown v. McGee*, 2017 WL 1364214, at *11–15 (E.D. Va. Mar. 24, 2017) (discussing and citing precedent on the absence of either a state or federal right "to obtain admission to the college of [one's] choice"); *cf. Keegan v. Dalton*, 899 F. Supp. 1503, 1513 (E.D. Va. 1995) ("Though one may apply to medical school, for example, it does not follow that one has a right to be accepted."). Likewise, there is no legal entitlement to career advancement or to be spoken highly of in a letter of recommendation. *See, e.g.*, *Siegert v. Gilley*, 500 U.S. 226, 233–35 (1991) (rejecting a stigma-plus claim premised on the "serious impairment of [the plaintiff's] future employment opportunities" from an allegedly stigmatizing letter of recommendation); *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309–10 & n.16 (4th Cir. 2006) (holding that there is no deprivation of liberty when an official impairs a plaintiff's future employment opportunities, absent some additional alteration of legal status).

Courts have found a cognizable liberty interest where a student is expelled or suspended upon charges of serious misconduct. *See, e.g.*, *Doe*, 133 F.4th at 319 (a student plausibly alleged a liberty deprivation from "his permanent expulsion from the entire North Carolina public university system" for alleged sexual misconduct); *Goss v. Lopez*, 419 U.S. 565, 574–75 (1975) (high school students suffered a liberty deprivation from a ten-day suspension for disruptive and violent

conduct). *But see Paul*, 424 U.S. at 710 (suggesting that *Goss* rested on its conclusion "that Ohio law conferred a right upon all children to attend school, and that the act of the school officials suspending the student there involved resulted in a denial or deprivation of that right" (citing *Goss*, 419 U.S. at 574–75)); *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86–90 (1978) (discussing "the significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct").

Here, by contrast, the crux of Plaintiff's theory is that his right to liberty was violated because the allegedly stigmatizing Committee Letter caused his rejection to thirty medical schools and hampered his future career. *See* Dkt. 1 ¶¶ 9–10, 199–202, 223. But Plaintiff, as an applicant, held no pre-existing legal status at any of the thirty medical schools that could be altered or extinguished. *See Siegert*, 500 U.S. at 234. Plaintiff's failure to obtain admission to an institution in which he had no current enrollment is not a change of legal status; it is simply the failure to obtain a new one.[4]

---

[4] Occupational liberty principles extend due process protections to state action that wholly forecloses a person from pursuing a career in a particular field. *See, e.g.*, *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573–74 & n.13 (1972); *Ridpath*, 447 F.3d at 307–08, 309–12. But Plaintiff's contention that the Committee Letter "destroyed his chances of being able to pursue a career in medicine" cannot sustain his claim because it is factually implausible. Dkt. 1 ¶ 223. Plaintiff acknowledges that he is not required to submit the letter with any future applications (*id.* ¶ 85), and that the thirty schools to which he applied represent only 20% of allopathic medical schools in the United States (Dkt. 32 at 4). Further, Plaintiff's contention that those thirty schools will retain access to the letter is contradicted by the same website he cites to support it. *Compare id.* at 4–5 & n.4, *with AMCAS FAQs*, Am. Med. Coll. Application Serv., https://tinyurl.com/3kw4wn7u (last visited Nov. 10, 2026) ("The AMCAS program does not keep letters on file from applications in previous years. You must resubmit letters of evaluation to the AMCAS program for each application cycle you apply."). *See* Fed. R. Evid. 201(b)(2).

Even more fundamentally, the Committee Letter, while critical of Plaintiff's maturity, consistency, and social skills, praised Plaintiff's academic record and ultimately recommended him for admission. *See* Dkt. 1 ¶¶ 89–92. This is not a case where Plaintiff was "effectively excluded from [his] trade or calling as by being thrown out on the street." *Ridpath*, 447 F.3d at 311 (quoting *Lawson v. Sheriff of Tippecanoe Cnty., Ind.*, 725 F.2d 1136, 1139 (7th Cir. 1984)).

ii. *Property Interest*

Plaintiff also alleges that it is "well established that a person has a protected property interest in pursuing and continuing [their] education, as well as in future educational and employment opportunities and occupational liberty." Dkt. 1 ¶ 224. This suffers from the same flaw as Plaintiff's proffered liberty interest: courts interpreting Virginia law have never recognized an entitlement to secondary education as a general matter,[5] and "education is not a 'right' granted to individuals by the [U.S.] Constitution." *Plyler v. Doe*, 457 U.S. 202, 221 (1982) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973)).

Because Plaintiff failed to allege a cognizable liberty or property interest that was altered or extinguished by the Committee Letter, he has failed to state a claim for denial of procedural due process. Accordingly, Count I must be dismissed.

**2. Defamation (Count II)**

Redress for state-caused reputational harm without an accompanying extinction or alteration of legal status is left to state law. *See Paul*, 424 U.S. at 710–12. "In Virginia, when a plaintiff alleges defamation by publication, the elements are '(1) publication of (2) an actionable statement with (3) the requisite intent.'" *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015) (quoting *Tharpe v. Saunders*, 285 Va. 476, 480 (2013)). Plaintiff alleges the Committee Letter was defamatory—that it was published to his applicant profile, that it was "false, unsupported, and directly contradicted by [his] individual recommendation letters," and that it was written in a "culpable or grossly negligent manner." Dkt. 1 ¶¶ 235, 234, 237. *See generally id.* ¶¶ 229–242

[5] *See, e.g.*, *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 239 (4th Cir. 2021); *Doe*, 133 F.4th at 318–19; *McGee*, 2017 WL 1364214, at *11–12; *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 720–21 (E.D. Va. 2015); *Doe v. Alger*, 175 F. Supp. 3d 646, 660 (W.D. Va. 2016); *Byerly v. Va. Polytechnic Inst. & State Univ.*, 2019 WL 1370873, at *4 & n.5 (W.D. Va. Mar. 25, 2019).

(Count II). Defendants argue that Count II is deficient on all three elements. *See* Dkt. 26 at 22–30. The Court agrees that Plaintiff failed to allege an actionable statement and will dismiss on those grounds.

"An actionable statement is both false and defamatory." *Schaecher*, 290 Va. at 91 (internal quotation omitted). A plaintiff must plausibly allege that the statement is untrue and has "the requisite defamatory 'sting.'" *Id.* at 92 (quoting *Air Wis. Airlines Corp. v. Heoper*, 571 U.S. 237, 255 (2014)). But because defamation invariably involves speech, the First Amendment imposes limits on the scope of liability. *See, e.g.*, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–20 (1990). Relevant here, an actionable statement must also be "reasonably understood as stating or implying actual facts" about the plaintiff. *Schaecher*, 290 Va. at 93; *see also Schnare v. Ziessow*, 104 F. App'x 847, 851 (4th Cir. 2004) ("Though the *Milkovich* Court explicitly declined to provide an 'exemption [from liability] for anything that might be labeled opinion,' it emphasized that a statement must state or imply a defamatory fact to be actionable." (quoting *Milkovich*, 497 U.S. at 19)).

Courts are therefore tasked with distinguishing pure expressions of opinion, which are not actionable, from opinions with an embedded fact, which are actionable if the embedded fact is also false and defamatory. *See Williams v. Garraghty*, 249 Va. 224, 233 (1995) ("[Under Virginia law, it] is for a court, not a jury, to determine, as a matter of law, whether an alleged defamatory statement is one of fact or of opinion."). The question is not "whether the statements at issue are true or false; only whether they are *capable* of being proved true or false." *Raytheon Tech. Servs. Co. v. Hyland*, 273 Va. 292, 304 (2007) (emphasis added). If answered in the affirmative, the court must then determine "as a [] matter of law whether [the] statement is reasonably capable of defamatory meaning." *Schaecher*, 290 Va. at 94; *see also Hyland v. Raytheon Tech. Servs. Co.*, 277

Va. 40, 49 (2009) (explaining how "the determination whether an allegedly defamatory statement is false ordinarily presents a factual question to be resolved by a jury," save for the rare instance where "a plaintiff unequivocally has admitted the truth of an allegedly defamatory statement"). *See generally Handberg v. Goldberg*, 297 Va. 660, 666–668 (2019) (discussing the trial court's "gatekeeping function" in a defamation action).

Plaintiff's Complaint reveals five pertinent statements from the Committee Letter:

1. Plaintiff "would benefit from some maturing years before heading to medical school."
2. Plaintiff "was not as consistent with keeping his shadowing assignments . . . as expected."
3. Plaintiff "was not as consistent with . . . communicating his intended class absences as expected."
4. Plaintiff "at times had difficulty following the flow of conversation in class."
5. "[M]any social interactions with" Plaintiff "felt awkward or disjointed."

*See* Dkt. 1 ¶¶ 232–33. Defendants retort that the Committee Letter, taken as a whole, "*opined* on [Plaintiff's] readiness to attend medical school and the reasons why he would benefit from additional maturing years." Dkt. 26 at 25 (citing Dkt. 1 ¶ 232). In that context, Defendants argue that Statement 1 is "clearly opinion on its face," and that the others "were necessarily part of the Committee's overall recommendation and are, therefore, opinions as well." *Id.*

Statements 1, 4, and 5 are pure expressions of opinion.[6] The operative parts of these statements are that Plaintiff, relative to other students, was immature, awkward, and had occasional difficulty following class conversation. *See Raytheon*, 273 Va. at 304–06 (identifying the "operative part," *i.e.*, the "allegedly defamatory aspect" or "negative import," of each challenged statement). It is indeed true, as Plaintiff points out, that the Committee's assessments differ from

---

6 To the extent that Plaintiff alleges that his level 2 "recommended with reservations" rating was itself defamatory, the Court finds that it is also a pure expression of opinion.

those of his professors in their individual letters of recommendation. *See* Dkt. 1 ¶¶ 52–80 (detailing the individual letters of recommendation). But that only suggests a difference of opinion between the professors and the Committee. One person, endowed with the gift of gab, might believe an individual to be a poor conversationalist, while another person, more maladroit in nature, might believe that same individual to be perfectly charming. Likewise, someone with a particularly high standard for maturity might conclude that someone is immature where most others would disagree. This is to say that the Statements 1, 4, and 5 are "relative in nature and depend largely upon the [Defendants'] viewpoint." *Raytheon*, 273 Va. at 303 (quotation omitted); *accord Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 714–16 (2006). They are fundamentally incapable of empirical proof, and they are therefore not actionable in defamation.

Statements 2 and 3 involve more difficult combinations of opinion and fact. The operative part of each statement is that Plaintiff failed to meet expectations in terms of attending shadowing assignments and communicating class absences. *See* Dkt. 1 ¶ 125 (construing these statements as "concerning Plaintiff's attendance, reliability, and communication"). The inclusion of "as expected" makes the statements relative—Plaintiff was inconsistent *relative to* what is expected of students. But implicit in each statement is that Plaintiff failed to attend at least one shadowing assignment and failed to communicate at least one class absence—matters of fact. *See* Dkt. 32 at 18–19.

The Court is satisfied that Statements 2 and 3, on the whole, fall more toward fact than opinion. *See Schaecher*, 290 Va. at 93–94 (instructing courts to consider challenged statements in context and according to "their plain and natural meaning" (quotation omitted)); *Raytheon*, 273 Va. at 303–04 (same). It is impossible to separate the negative import of each statement from the assumptions that Plaintiff, in fact, did not "keep[] his shadowing assignments" and did not

"communicat[e] his intended class absences" (Dkt. 1 ¶ 233) at least once, as even a single instance of either might reasonably fail to meet expectations in a "highly selective" program (*id.* ¶ 26). These assumptions, moreover, are susceptible to empirical proof. *See* Dkt. 32 at 19 (suggesting proof "by reviewing schedules, attendance records, emails, messages, and testimony from those with firsthand knowledge"). That the Committee Letter ultimately phrases each statement as a relative assessment does not negate that, if the factual predicates are false, then the assessment must also be false. *See Milkovich*, 497 U.S. at 18–19.

Statements 2 and 3 will therefore support Plaintiff's claim if they are also plausibly false and defamatory. However, because neither statement is reasonably capable of defamatory meaning, Plaintiff's claim fails.[7] *See Schaecher*, 290 Va. at 94.

Statements that are merely "insulting, offensive, or otherwise inappropriate" are not defamatory. *Id.* at 92 (quoting *Yeagle v. Collegiate Times*, 255 Va. 293, 296 (1998)). The bar is much higher: "Reputation must be affected to a magnitude sufficient to render one odious, infamous, or ridiculous, or subject to disgrace, shame, scorn, or contempt." *Id.* at 101; *accord* Restatement (Second) of Torts § 559 (A.L.I. 1977).

Therefore, and relevant here, negative assessments of a person's professional conduct are rarely defamatory unless they suggest "an unfitness to perform the duties of a job or lack of integrity in the performance of duties." *Echtenkamp v. Loudon Cnty. Pub. Schs.*, 263 F. Supp. 2d 1043, 1061 (E.D. Va. 2003) (citing *Yeagle*, 255 Va. at 297 n.2); *see McBride v. City of Roanoke Redevelopment & Hous. Auth.*, 871 F. Supp. 885, 892 (W.D. Va. 1994), *aff'd sub nom. McBride v.*

[7] Independently, Statement 3 is not actionable because Plaintiff concedes its veracity, acknowledging three unexcused absences in a class taught by Dr. Powers. *See* Dkt. 1 ¶¶ 132, 134; *see also Edwards v. Schwartz*, 378 F. Supp. 3d 468, 521 (W.D. Va. 2019) ("When falsity is an element of a state law defamation claim, as it is in Virginia, federal courts have required plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement false.").

*Glenn*, 78 F.3d 579 (4th Cir. 1996) ("[A]llegations of unsatisfactory job performance do not in and of themselves so harm [one's] reputation . . . .").

Statements 2 and 3 do not plausibly rise to this level. The purpose of the Committee Letter was to "convey[] UVA's institutional assessment of Plaintiff's readiness and suitability for medical school" (Dkt. 1 ¶ 194), and its general tenor was that Plaintiff possesses the raw intellectual capability but would first "benefit from some maturing years" (*see id.* ¶¶ 89–92), reflected in its recommendation "with reservations." *See also Edwards*, 378 F. Supp. 3d at 508 ("[I]t is incumbent upon courts to look not just at the allegedly defamatory words themselves, but also at the context and general tenor of its message."). To concretize the Committee's "reservations," the letter stated that Plaintiff "was not as consistent with keeping his shadowing assignments or communicating his intended class absences as expected." Dkt. 1 ¶ 233.

These statements criticize Plaintiff's communication and consistency regarding his attendance—they do not, for instance, suggest that he was chronically absent or that he abandoned his clinical duties. *See, e.g.*, *Fuste v. Riverside Healthcare Ass'n, Inc.*, 265 Va. 127, 132–33 (2003) (a statement suggesting two doctors "'abandoned' their patients and that there were 'concerns about their competence'" was defamatory *per se*); *Fleming v. Moore*, 221 Va. 884, 890 (1981) (requiring that a statement be "necessarily hurtful" to a plaintiff's occupational fitness to be defamatory *per se*). Moreover, and as Plaintiff recognizes, these statements were not offered to suggest that he was wholly unsuited for medical school—they were offered in support of his assessment as capable yet not presently ready for medical school. *See* Dkt. 32 at 20 ("[The Committee Letter] conveyed that Plaintiff presently lacked the maturity, judgment, and readiness required to enter medical school."); *id.* ("Read in that context, the Committee was telling medical schools that Plaintiff was not yet fit to begin medical training and should not be admitted during

the current application cycle.”). While this assessment may have harmed Plaintiff’s candidacy in the 2025 application cycle, it did not malign his reputation as to render him “odious, infamous, or ridiculous” or subject him to “disgrace, shame, scorn, or contempt.” *Schaecher*, 290 Va. at 101.

Because Plaintiff failed to identify any actionable statement in the Committee Letter, he failed to state a claim for defamation. Accordingly, Count II must also be dismissed.

## IV. CONCLUSION

The Defendants’ motion to dismiss (Dkt. 25) is hereby **GRANTED**. Count I, II, and III shall be **DISMISSED WITHOUT PREJUDICE**.

The Clerk of Court is directed to send a copy of this memorandum opinion to all counsel of record and to strike this case from the active docket.

It is **SO ORDERED.**

Entered this 18th day of November, 2026.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE